UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

RENE JOSEPH FOLEY BEY, ET AL            CIVIL ACTION NO. 19-cv-1262

VERSUS                                  CHIEF JUDGE HICKS

STEVE PRATOR, ET AL                     MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Rene Joseph Foley Bey and Julia Mae Foley Bey ("Plaintiffs"), who are self-represented, were arrested at the Caddo Parish Courthouse for remaining after being forbidden. The arrests followed Plaintiffs' discussion with deputies about their request to enter the courthouse without passing through the metal detector at the entrance. Plaintiffs allege that they were later subjected to mistreatment and harsh conditions during a short stay at the Caddo Correctional Center ("CCC"). Friends soon posted bail to obtain their release, and the district attorney later dismissed the charges against them.

Plaintiffs' original complaint named several defendants. The court pointed out that there did not appear to be a valid basis to assert a claim against two of the defendants, the State of Louisiana and Attorney General Jeff Landry. Doc. 2. Plaintiffs then filed an amended complaint (Doc. 5) that dropped those two defendants from the case, and the other defendants were served. Certain defendants associated with CCC filed motions to dismiss. The court granted motions to dismiss Caddo Parish, Parish Administrator Woodrow Wilson, CCC Commander Bobby Wyche, and Deputy John May. The court also dismissed

all federal claims against Sheriff Steve Prator, but he remained a defendant in his official capacity because of his potential vicarious liability for state law claims against the three deputy defendants who did not join the motion to dismiss. Docs. 28 & 31.

The three deputies who were involved in the arrest at the courthouse—Mark Terry, LC Cope, and Glyn Best—filed an answer. The court issued an order (Doc. 32) that allowed a reasonable time for discovery and the filing of any dispositive motions. Those three deputies, along with Sheriff Prator, have filed a Motion for Summary Judgment (Doc. 44) that asks the court to dismiss all claims against the remaining defendants. For the reasons that follow, it is recommended that the motion be granted.

**Summary Judgment Record**

   **A. Plaintiffs' Declarations**

Each plaintiff has submitted two documents titled Affidavit of Truth. The first affidavit for each begins by stating that it is made under penalty of perjury, and it is dated and signed. The affidavit includes a "jurat" by a notary public that states the document was "subscribed and affirmed to before me" by the person whose signature was placed on it. Within this first affidavit, each plaintiff states that the contents of the second, attached Affidavit of Truth are true and correct and recount the details of the events on the date of the arrests.

A declaration in compliance with 28 U.S.C. § 1746 can be competent summary judgment evidence. Hart v. Hairston, 343 F.3d 762, 764 n.1 (5th Cir. 2003); Cooper v. Fisher, 676 Fed. Appx. 355, 357 (5th Cir. 2017). The statute requires that an unsworn declaration be "in writing of such person which is subscribed by him, as true under penalty

of perjury, and dated, in substantially the following form: … 'I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)'." Plaintiffs two-document approach is unorthodox, but the court finds that the statements are made under penalty of perjury and otherwise in substantial compliance with the statute. Thus, the *facts* stated in the affidavits of truth are accepted as competent summary judgment evidence. On the other hand, mere statements of ultimate or conclusory facts are insufficient to defeat a motion for summary judgment. Galindo v. Precision American Corp., 754 F.2d 1212, 1216 (5th Cir. 1985); Edith Darby v. Primerica Life Ins. Co., 2021 WL 1753812, *2 (E.D. La. 2021). Statements of that nature will not be considered.

Rene and Julia Foley Bey state that they are Moorish American Nationals who together approached a security guard at the metal detector inside the Caddo Parish courthouse. Rene states that he greeted the officer, "Islam, we come to you in peace." He then asked the officer if he was a public servant under oath to uphold the constitution. Rene also announced that the couple were Moorish American Nationals who wished to conduct affairs inside the building, but they did not consent to what they believed to be an unreasonable search in violation of the Fourth Amendment. Plaintiffs state that the officer told them to step back, and he called his supervisor.

Plaintiffs state that Deputy Mark Terry was summoned, and he joined the discussion. Rene repeated his request to enter the courthouse without being searched. Deputy Terry told him that all the Plaintiffs needed to do was empty their pockets, put their property in bins, and walk through a metal detector. Rene responded that such a screening

was unconstitutional, and Terry told him that the couple would not go further into the building without a screening.

Rene asked to speak to a supervisor, and Deputy Terry said that he did not have one. Rene then asked to write down Terry's name and badge identification, after which they would leave the building. Terry said that Plaintiffs would need to leave after Rene recorded the information. Rene states that he was in the process of writing down the information on a folder when Terry threatened that if Plaintiffs did not leave before he counted to three, they would be arrested. Julia states, "Without pausing, Terry rattled off, '1,2,3, you are under arrest.'" Terry ordered Deputy LC Cope to arrest and handcuff Rene. Rene asked what crime he had committed, and Deputy Terry told him he failed to leave a forbidden place. Deputy Terry then asked Julia what she wanted to do. Julia responded that she wanted to leave with her husband, and Deputy Terry ordered another officer to arrest her as well.

The officers then took the couple into the basement of the courthouse (where the sheriff has offices). Rene states at length how he attempted to explain to the deputies the law as it relates to Moorish American Nationals. He complains that Deputy Cope had him turn and face the wall, then proceeded to manhandle him. Cope removed from Rene's head his red Moorish fez. Rene states that he told Cope that the fez was his religious headdress, and he complained that the deputy had no right to take it off his head. Rene was then released from the handcuffs and forced to put his hands on top of his head. Rene states that Cope demanded that he remove a chain from around his neck. When Rene asked why, Cope ripped the chain from his neck and broke it. He also ordered Rene to remove his

Moorish flag pendant from his shirt, his tribal red-feathered earring, an elephant faceted finger ring, and a gold finger ring. Cope removed the contents of Rene's pockets, which included a copy of the constitution and a wallet. This and other property was placed in an envelope.

Julia states that she was separated from Rene after they reached the basement. Her handcuffs, or shackles as she calls them, were removed from her wrists. A female officer took her purse and keys and asked what was on Julia's head. She replied, "This is my turban, my religious national headdress." The officer told her to take it off, and Julia stated that she could not remove it in the presence of others. The officer allegedly threatened Julia, who then removed the headdress in what she contends was a violation of her religious liberties. Julia states that her other personal property was collected, and she was patted down. The couple was later rejoined and transported to CCC. The district attorney later dismissed all charges against Plaintiffs.

### B. Video Recording

Plaintiffs submit a copy of the courthouse surveillance recording, which begins with their entry into the courthouse and ends with their arrest. The recording is about ten minutes long and has good video quality but no audio. It shows Plaintiffs enter the lobby of the courthouse and stop before the metal detector. They appear to have a brief discussion with one of the two officers working the area, and they eventually stepped aside so that other visitors to the courthouse could pass through security. A little more than two minutes into the recording, another officer arrived and spoke to Plaintiffs for more than two minutes while several other visitors passed through security. Two more officers then arrived in the

area, and one of them, presumably Deputy Terry, began to speak to Plaintiffs. After about two minutes of discussion, which does not appear to be heated or animated on either side, one deputy in the area held open the door of the courthouse as if to allow Plaintiffs an opportunity to leave. Rene was then handcuffed, and Julia was handcuffed soon afterward. Both were patted down, and they were then led past the metal detector (without going through it) and into the courthouse.

### C. Defendants' Declarations

Deputies Terry, Best, and Cope were involved in the arrest of Plaintiffs at the courthouse. Each deputy has offered a declaration pursuant to Section 1746. They explain that courthouse security involves the screening of visitors for weapons, and that includes both stationary and handheld metal detectors. All persons entering the courthouse are required to be screened due to safety concerns of the building, which houses judges, the district attorney, and several law enforcement officers. There are often court proceedings with potential violence among the witnesses and parties, and there are numerous violent felony prisoners who are moved to courtrooms and holding cells in public spaces, all posing security risks. The deputies state that adequate screening of visitors is extremely important and a necessary practice.

Deputy Glyn Best states that he was working security on September 28, 2018 when Rene Joseph Foley Bey attempted to enter the courthouse. Best told Rene that he was required to be screened to enter, but Rene refused. Best contacted Lt. Mark Terry by radio and requested that he assist.

Lt. Terry states that he told Rene repeatedly that he must leave the courthouse if he would not agree to be screened. Rene was finally told that he would be given to the count of three to either agree to leave or be arrested. He did not leave, so he was arrested. Lt. Terry says that Julia was then told that she would be arrested if she did not agree to leave. She looked to Rene for advice "and then declined to leave so elected to be arrested as well." Deputy LC Cope was also in the area, and he offers a similar description of the arrest. Both Cope and Terry state that the Foley Beys were arrested for remaining after being forbidden, in violation of La. R.S. 14:63.3.

With respect to the complaints about the removal of head gear, the three deputies state that none of them recalls personally removing Plaintiffs' head gear or asking that they remove it. However, the deputies explain that it would be ordinary practice to search for weapons or contraband once a person has been arrested, and that search would include the arrestee's head gear.

**False Arrest; Qualified Immunity**

Plaintiffs' main complaint about the events that took place at the courthouse is that they were subjected to a false arrest that violated the Fourth Amendment and is actionable under 42 U.S.C. § 1983. Defendants argue that the arrest was lawful because they had probable cause to arrest Plaintiffs for remaining after being forbidden. They also argue that they are entitled to qualified immunity from any false arrest claim.

When reviewing a motion for summary judgment, the court must view all of the facts in the light most favorable to the non-moving parties and draw all reasonable inferences in their favor. But an assertion of qualified immunity alters the standard. Once

qualified immunity is asserted, "the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." Trammell v. Fruge, 868 F.3d 332, 338 (5th Cir. 2017). Nonetheless, all inferences are still viewed in the light most favorable to the plaintiff. Brown v. Callahan, 623 F.3d 249, 253 (5th Cir. 2010).

The Fourth Amendment protects citizens from arrests unsupported by probable cause. Club Retro, L.L.C. v. Hilton, 568 F.3d 181, 204 (5th Cir. 2009). Probable cause exists when the totality of facts and circumstances within a police officer's knowledge are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense. Flores v. City of Palacios, 381 F.3d 391, 402 (5th Cir. 2004). The probable cause can be for any crime, not just the one the officer subjectively considered at the time. Davidson v. City of Stafford, 848 F.3d 384, 392 (5th Cir. 2017).

Qualified immunity grants police officers some wiggle room for mistakes when it comes to probable cause. Plaintiffs must not only show that there was no probable cause but also that the "officers were objectively unreasonable in believing there was probable cause for the arrest." Davidson, 848 F.3d at 391. Put differently, qualified immunity protects officers so long as they had "arguable (that is, reasonable but mistaken) probable cause for the arrests." Club Retro, 568 F.3d at 207.

Plaintiffs were arrested for violation of La. R.S. 14:63.3. The statute states: "No person shall without authority go into or upon or remain in or upon … any structure … or immovable property, which belongs to another, including public buildings and structures … or any part, portion, or area thereof, after having been forbidden to do so, either orally

or in writing … by any owner, lessee, or custodian of the property or by any other authorized person." Whoever violates the statute is guilty of a misdemeanor and can be fined not more than $500 or imprisoned in the parish jail for not more than six months, or both.

Courts have held that government authorities may require visitors to a courthouse to comply with reasonable security screening measures, including passing through a metal detector or magnetometer. See, e.g., McMorris v. Alioto, 567 F.2d 897 (9th Cir. 1978) (affirming summary judgment dismissing Fourth Amendment claims asserted by an attorney regarding magnetometer screening required to enter state courthouse); Downing v. Kunzig, 454 F.2d 1230 (6th Cir. 1972) (rejecting attorney's Fourth Amendment challenge to search of briefcase required to enter federal building); Legal Aid Soc. of Orange Cty. v. Crosson, 784 F. Supp. 1127 (S.D. N.Y. 1992) (magnetometer search at courthouse was reasonable under Fourth Amendment); Gibson v. State, 921 S.W.2d 747 (Tex. App. 1996) (rejecting attorney's claim that metal detector search at county courthouse was unconstitutional); and Rhode Island Def. Att'ys Ass'n v. Dodd, 1980 WL 336519 (R.I. Super. 1980), aff'd, 463 A.2d 1370 (R.I. 1983) ("the use of metal detectors at the entrances to the Courthouse is reasonable."). And in Justice v. Elrod, 832 F.2d 1048 (7th Cir. 1987) the court affirmed the dismissal of claims by a pro se filer who wanted to enter a state courthouse to file a pleading but without passing through a security screening.

Plaintiffs refused to pass through the metal detector as required to remain in the courthouse, and they did not leave the premises when directed to do so by a sheriff's deputy, who is an authorized person within the meaning of the statute. Plaintiffs argue that

once Lt. Terry became firm in his direction that they leave that he did not allow adequate time for them to do so before they were arrested. The surveillance video submitted by Plaintiffs reflects a conversation of several minutes, where all concerned agree that the deputies told Plaintiffs that they would not be allowed to enter without going through the metal detector. Plaintiffs never made any move to leave despite the apparent invitation of one deputy who opened the door. They may disagree that they were given adequate time to exit, but even when the facts are viewed in the light most favorable to them, there is at least arguable probable cause for their arrest for remaining in the courthouse after being forbidden. The deputies are entitled to summary judgment based on their qualified immunity defense.

Support for this result is found in the analogous situation presented in Defrates v. Podany, 789 Fed. Appx. 427 (5th Cir. 2019), when a father who was at a school event was arrested for criminal trespass under a Texas law that made it illegal for a person to enter or remain on the property when he had received notice to depart but failed to do so. School officials had been concerned about the parent's behavior, and he had received prior trespass warnings. The father was allowed to attend an off-campus event with his son, but an officer confronted him when he left the event area and began to wander the halls. Mr. Defrates was told to either go back to the presentation room or leave. After various discussions with school administrators, the officer arrested Mr. Defrates. A defense witness said that Defrates told officials that they would have to arrest him because he was not leaving, while Mr. Defrates' summary judgment evidence claimed that he calmly explained that he was going to watch his son's presentation and would leave as soon as it ended. The Fifth Circuit

affirmed summary judgment for the officer on a false arrest claim, reasoning that the officer was entitled to qualified immunity because he had arguable probable cause to arrest Defrates for criminal trespass.

**Search of Headgear**

Plaintiffs complain that, after they were arrested, they were made to remove their fez and turban, which they describe as religious headgear. Plaintiffs argue that being required to remove the headgear under those circumstances violated their religious liberties.

It is well established that an officer may search a person incident to an arrest. "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape." Chimel v. California, 89 S.Ct. 2034, 2040 (1969). "Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated." Id. This rule has been applied to permit, for example, the search of the pockets of a driver who was arrested for operating a vehicle with a revoked license. U.S. v. Robinson, 94 S.Ct. 467 (1973).

The officers had the authority, after Plaintiffs were arrested, to conduct a reasonable search of their persons to ensure that they were not armed with a weapon or a potential means of escape. Such a search reasonably includes checking the arrestee's clothing, including a hat or other headwear, which could certainly conceal a weapon or other contraband that officers would not want to enter the jail. Plaintiffs contend that the fez and turban at issue here were religious in nature, but they do not present legal authority that

holds an officer who conducts a search incident to an arrest is prohibited from searching a fez, turban, kippah, hijab, or other item of religious clothing. Absent the presentation of such authority, Plaintiffs have not met their burden of overcoming the qualified immunity defense by demonstrating that the officers violated clearly established law. Accordingly, the deputies are entitled to summary judgment with respect to the claims that the searches incident to arrest were unconstitutional.

**State Law Claims**

Article 1, Section 5 of Louisiana's constitution protects against unreasonable searches and seizures, which is analogous to the federal Fourth Amendment. The qualified immunity analysis that federal courts apply to Fourth Amendment Section 1983 claims applies equally to Louisiana constitutional claims. Roten v. City of Minden, 2017 WL 1398655, *8 (W.D. La. 2017) (Hicks, J.); Moresi v. State Through Dep't of Wildlife & Fisheries, 567 So. 2d 1081, 1094 (La. 1990) ("we believe that a qualified immunity is justified in an action against state officers or persons acting under color of state law for damages caused by a violation of Article I, § 5 of the Louisiana Constitution").

Plaintiffs' false arrest claims under state law are subject to summary judgment for the same reasons given with respect to the federal claims; the officers had probable cause, or at least arguable probable cause, to arrest Plaintiffs for remaining after being forbidden. With respect to their complaints about being searched, Louisiana law provides that "[a]fter making an arrest, an officer has the right to thoroughly search a defendant and his wingspan, or lunge space, for weapons or evidence incident to a (valid) arrest." State v. Anglin, 303 So.3d 1078, 1081 (La. App. 1st Cir. 2020). Plaintiffs have not pointed to any

Louisiana decisions that limit that authority when the arrestee is wearing clothing associated with his or her religion. Accordingly, the deputies are also entitled to summary judgment with respect to any state law claims based on the search of Plaintiffs and their headgear.

**Other Claims; Sheriff Prator**

The court earlier dismissed the claims against all defendants associated with CCC. It is recommended above that the court dismiss all claims against the deputies who were involved in the arrest at the courthouse. The only remaining defendant is Sheriff Steve Prator. The court retained him as a defendant because of his potential vicarious liability for state law claims. It now has been recommended that all state law claims against the deputy defendants be dismissed, so all remaining claims against Prator should be dismissed as well.

Plaintiffs' amended complaint includes several claims that their rights were violated, particularly at CCC, by unknown or unnamed deputies. The potential claims are based on everything from an executive order signed by President Trump to the Religious Land Use and Institutionalized Persons Act to the 1836 United States-Morocco Treaty of Peace and Friendship.

Each defendant who has been actually named by Plaintiffs has now responded to the complaint and achieved the dismissal or recommended dismissal of all claims against them. Plaintiffs had a reasonable opportunity to conduct discovery, and they did so, as shown by their motion to compel, which the court granted in part. Doc. 48. But Plaintiffs have not taken any steps to amend their complaint and name as defendants any of the

deputies who are generically referenced in the amended complaint. Any such motion would not be viewed with favor at this stage of the case, after the close of discovery and after the filing and briefing of a potentially case-dispositive motion for summary judgment. All claims against actually named defendants have now been addressed, so a final judgment ending this litigation should be entered if this report and recommendation is adopted.

Accordingly,

It is recommended that Defendants' Motion for Summary Judgment (Doc. 44) be granted and that all claims against all remaining defendants be dismissed with prejudice.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 14th day of May, 2021.

Mark L. Hornsby
U.S. Magistrate Judge